Thank you. We move to the third case this morning, Kemplen v. Saul. Thank you. Mr. Richter, you may begin yours, Mr. O'Dealy. Thank you, Your Honors, and may it please the Court. My name is Matt Richter. I represent Plaintiff Appellant Cheryl Kemplen. In this case, the ALJ committed error in unilaterally interpreting complex medical evidence and at what frequency Plaintiff Appellant could engage in handling and fingering over the course of an eight-hour workday. The ALJ in the decision acknowledged that no state agency reviewing physician was even aware of Appellant's subjective complaints of hand-related limitations and were likewise not privy to a substantial portion of complex medical imaging and correlative clinical findings, which would support more restrictive hand-use limitations than what the ALJ ultimately assessed. Mr. Richter, can I just ask you, so that we're see if we're on the same page, it's hard for me to, the claim onset date here was, what, 2015 or so, or 2014, and it's hard for me to see any problem with the ALJ's decision, in essence, prior to, for time periods prior to the 2017 medical information shortly before the hearing that you're focused on in your brief. Is what you're seeking here, as a practical matter, really just a kind of a partial decision? Well, that's part of the time period. Yeah, that's correct, Your Honor. But in addition to that, what having a medical expert look at this case could do is they could speak to whether this degenerative issue, which, as the court knows, is something that doesn't happen overnight, they could also speak to whether such limitations would relate back even further than that 2017 era. Right, but in terms of the time period in which she was complaining about the ability to manipulate and handle things, which obviously winds up being critical to the Step 5 analysis here, maybe I'm, you know, you guys know the record better than I do, but I don't remember there being a whole lot of evidence about the degenerative condition with respect to hands before 2017. Right, and that's certainly a possibility on remand, Your Honor, that the judge, in favorable finding as of that 2017 time period. Let me ask you, Mr. Richter, to address what concerns me most about the claimant's position here. She was represented by counsel. The relevant medical evidence was from, if I recall correctly, just a few weeks before the hearing, before the ALJ. And her lawyer said to the ALJ, in effect, go ahead. We don't need more. Why does the ALJ, and you're saying the ALJ, in essence, made a mistake in, well, or tell me why it's wrong to see that as the ALJ, in essence, handling the case as claimant and her attorney requested. Well, because the ALJ should know that this court has continually held that when complex imaging, like an MRI, like an x-ray of the elbow or the bilateral hands that's shown a fracture, in answering a question as to whether, how often that claimant can use their that a medical expert scrutinize that imaging and that evidence. We know that line of cases, but we also have the line of cases that say we generally assume that a claimant represented by counsel before the ALJ is making her best case. And I agree with you, Your Honor. I think that counsel at the hearing should have at least pointed it out to the ALJ. But I can speak to the McHenry case, which I represented that appellant here at the Seventh Circuit in which the previous counsel, likewise, didn't make any request for a medical expert to look at the objective MRI. And yet the court still found that because of the significance of that imaging that the judge should have on his own accord subjected it to a medical expert opinion. Especially here, where what you have is, you have the outcome-determinative question. She had a sedentary residual functional capacity. She was an individual under the age of 50 at that time. And really, one of the only ways for such an individual to be approved for benefits on a physical basis is to have significant hand limitations when confined to a sedentary residual functional capacity. And so, had a doctor looked at the MRI, had a doctor looked at the hand x-ray that showed a fracture in her left hand, or the... Sorry, Mr. Griffith. How significant is the fractured finger? Fractures heal. We're talking about conditions that have to be disabling for 12 months or more, right? Right. Fractures do heal, Your Honor, but it's a significant question, or it's a significant finding when you're talking about the ability to consistently handle things over the course of an eight-hour workday. What's more significant, certainly, is the cervical spine MRI that indicates etiology, which as I alluded to in the appellant's brief, it's indicative of compression of the cervical spinal cord as per the National Institute of Health, and could be what was causing her hand limitations. But I think with that, Your Honor, I will reserve my time unless there are any further questions. Thank you, counsel. I guess I would like to ask you to address, Mr. Griffith, one other concern, which is along these lines. Is there any obligation in seeking reversal on this kind of a ground to come forward with some indication of the significance of what this actually shows? As opposed to just saying, I'm worried about your urging us to adopt a rule that in essence leaves the record open indefinitely without having to come forward with any threshold showing of significance or materiality for the bottom line result. Your Honor, I would disagree with that characterization of what appellant is seeking here. It's not a question of keeping the record open. It's a question of when the judge sees that there's significant objective medical imaging that's complex and that where there is an outcome-determinative question that the answer lies within the medical imaging, that we need a doctor to come to that conclusion rather than a layperson ALJ. And what you have here to support the significance of this imaging is a National Institute of Health characterization of the etiology it demonstrated and what that can cause. There is no, there has been no that I'm aware of, any decision by this court that requires a third-party medical opinion from a treating physician or examining physician in order for an ALJ to need to subject it to a social security contracted reviewing expert. Thank you. Thank you.  Thank you, Your Honor. May it please the court, Javid Adili appearing on behalf of Commissioner of Social Security. The ALJ in this case thoroughly considered the record. There's no allegation that he did not and reasonably relied on the opinion by Dr. Aquino, the state agency reviewing doctor and the only doctor to opine about appellant's function limitations. Appellant asks the court to place the burden entirely on the ALJ by deciding that the ALJ erred by not seeking an additional opinion at the end of the record. But I'm sorry, were you speaking, Your Honor? No. Okay. But appellant's brief, I'm sorry, reply brief completely ignores the argument expressed in our brief that cases like Keyes and Olson, which address this specific situation, weigh against the finding that remand is appropriate. Because in those cases, the court found that the ALJ had properly committed no error in only mild changes to the claimant's respective conditions, to the conditions of Keyes and Olson. That is in Keyes, for example, there was an MRI that came in after the state agency doctor reviewed the record and it showed only mild changes to the individual's condition. Here, similarly, we have a cervical spine MRI that was performed in 2017, July 2017, that was of a piece that was essentially identical to the MRI in December 2015 that Dr. Aquino did review. How do we know that? So we know it for a number of reasons, Your Honor. Number one, Dr. Aquino specifically detailed the December 30th, 2015 lumbar spine MRI in her report at AR73, and that report appears in Exhibit 7F. The December 2nd, 2015 cervical spine MRI appears in Exhibit 6F and was submitted to the agency earlier. Also, on pages 70 and 71 of the record, Exhibit 7F corresponds on page, I believe, 70 to the set of evidence submitted from In Med Diagnostic Services, which corresponds to Exhibit 7F says it was submitted January 12th, 2016, about two weeks before Dr. Aquino opined. And Exhibit 6F was submitted, I think, December 29th, 2015, about a month before Dr. Aquino opined. And then finally, the report also cites... Excuse me, what is a lumbar spine? It's the lower back spine. I know. But what relevance does that have since I thought the focus here was on the cervical spine in 2017? Well, this is just to show that Dr. Aquino specifically cited something from evidence that came in afterwards. So we know that it was in the universe of evidence that Dr. Aquino reviewed. It was in the set of evidence that Dr. Aquino reviewed. Now, the cervical spine MRI may have had no particular significance to Dr. Aquino because Dr. Muhammad, Appellant's own doctor in 2017, Mike, looked at all of the MRI evidence and concluded that only the lumbar spine MRI, which Dr. Aquino did specifically cite the contents of, contained any indication of stenosis or nerve root compression. So that it said minimal, if any, nerve root compression, but that it had mild stenosis in the lumbar spine MRI. So the only MRI that had an indication of stenosis and in turn that an indication of compression or possible compression was that lumbar spine MRI that Dr. Aquino did specifically sort of explicitly cite. And it's telling that Appellant does not, in her reply brief, address Keyes or Olson in any way, because both of those cases counsel in this case a finding that the ALJ's inference that it was reasonable to rely on Dr. Aquino was appropriate. Both of those cases moderate this line of cases by saying, by standing for the proposition that first, ALJs may reasonably look at later evidence and if they can reasonably infer that that evidence, it shows only mild changes, don't need to go and secure the advice of an additional medical expert, but also for the proposition that the court should hold a claim in seeking relief from an agency decision to their burden to show harm by identifying some specific limitation compelled by the record that the ALJ omitted, right? So that's as we cited in our brief cases like Dudley, Best, Castile, Rice against Barnhart. Keyes and the other case are both non-presidential, correct? They're both unpublished. That's correct, Your Honor. But nevertheless, I would urge the court that they are worthy sort of in terms of their reasoning about this, these sorts of matters, because ALJs have to have some latitude. Otherwise, as the court said in Keyes, a case might never end, right? Appellants could continue to present evidence, thereby requiring ALJs to go ahead and secure an additional opinion. And at a certain level, as we argued in our brief, ALJs have to assess medical evidence. Sure. I guess the parade of horribles doesn't sound that horrible to me if we're talking about asking about evidence that exists at the time of the hearing. I mean, it still places the burden entirely on the ALJ. Because as Your Honor said to opposing counsel, there is an entirely separate line of cases that says if you are represented by counsel, you have contemporaneous medical care, you're expected to present your best case for benefits. So in a case like this, wouldn't we at least expect that appellant would go to her doctor and say, can you give me a medical opinion? Or go to the ALJ and explicitly say, I think this evidence merits an additional medical opinion. We have nothing like that. The question, of course, is the scope of that latitude to the ALJ. As I understand Mr. Richter's argument, there is enough that's gone on here as a result of the emergency room visit, the physical therapy, the x-rays themselves, that everyone would benefit from a second state agency consultation or some other review. Is there a certain line that you're saying we should draw? Well, the problem, of course, is that the specific facts of this case are going to set forth a rule that apply to cases going forward. So you want to set forth a rule that applies reasonably across the board. And one thing that I would say is contrary to appellant's arguments, appellant's allegations of arm and hand problems were in front of Dr. Aquino. So if you look at page 77 of the record, Dr. Aquino specifically notes appellant's allegation of trouble raising her arms, that she could not use one hand to do cooking because it caused pain, that she otherwise had problems using her hands. In her function report, which was also before Dr. Aquino on page 226 to 228, noted shoulder pain, joint pain, difficulty grasping. So these later allegations were of a piece with earlier allegations. She also made those allegations to her chiropractor, which is in exhibit 3F, which was also before Dr. Aquino. So appellant's argument that this later evidence about an inability to grasp were never presented to any doctor are false. And yet, nevertheless, Dr. Aquino did not opine any manipulative limitations. And appellant asks the court to upend a significant amount of case law that weighs against her without even sort of acknowledging her own burden to provide evidence in favor of her claim on this issue. And without acknowledging that two-year, I'm sorry? I was going to say, part of the problem here is the evidence was in the record, right? These scans, the 2017 scans were part of the record. The question I understood was not about supplementing the record in terms of the scans, but in terms of getting a doctor rather than the ALJ to interpret them. Am I correct about that? I think that is a fair characterization of appellant's argument, Your Honor. But doctor... Characterization of the record. Well, but asking for a doctor to review the evidence is appellant's argument, right? It is a fair characterization of the record that there's evidence that came in after Dr. Aquino's opinion. But Dr. Muhammad... I'm sorry? It was there before the hearing? Yes, but Dr. Muhammad reviewed... I see my time is about to expire. May I respond to this question, Your Honor? Dr. Muhammad reviewed the evidence two months after the July 2017 MRI and had an opportunity to weigh all of that evidence. And that took place one month before the ALJ hearing. And still, there's no indication that Dr. Muhammad thought any additional limitation flowed from those findings or that Dr. Octor did, who examined her that same month, who found her elbows to be quote-unquote fine. And there's no indication that she asked those doctors for an opinion or that her attorney did. And then, as Your Honor said at the hearing, didn't just ask for time to submit that evidence. Those doctors' notes, but didn't ask for an opinion or the ability to submit an opinion, and certainly could have. Right? She had the last best opportunity to do so. And to find in her favor would upend her burden to prove her limitations. If the court members have no additional questions, we, for the reasons expressed... If I could just ask one additional question. Sure. The ALJ concluded that, quite specifically, that Ms. Kemplin could engage in frequent handling but not constant, correct? That's correct. So, what was the medical basis in the record for the frequent but not constant limitations? The ALJ doesn't specify such a reason. But what the court should note in this circumstance is that the ALJ was giving partial credit, partially crediting her allegation of manipulative limitations. Two things that I would note in response to that. One is, one of the jobs that the vocational expert identified, the call-out operator, of which there were 67,000 nationally, would still have been available had the ALJ even limited her to only occasional grasping and reaching. So handling, fingering, and reaching. And so we can tell that the ALJ would have reached the same conclusion if he had limited her to occasional. But again, no doctor opined greater limitations than the ALJ found. And cases like Dudley, Castile, Rice, and Best would counsel against remand for that reason. Thank you very much, Mr. Gillick. Thank you, Your Honors. I appreciate your time. Mr. Richter, I'll give you another minute. Thank you, Your Honor. I'll just, I'll just very quickly, the state agency physician gave no indication that she And what I would say in support of that is, she looked at a cervical spine x-ray from April of that year. She went into detail with regard to the lumbar MRI. And there's just no mention of any cervical MRI imaging. It would seem that she would not have just ignored that had she been aware of it. And in addition, with regard to Dr. Muhammad, the signal intensification of the cervical spine that was observed there, that is indicative of cervical spinal cord compression. Not for me, but for the National Institute of Health. And I see my time is up. Thank you. All right. Thanks to both counsel and the case will be taken under advisory.